UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

CHARLES RAY BARNES,                         CIVIL NO. 09-3116 (DWF/JSM)

    Petitioner,

v.                                          **REPORT AND RECOMMENDATION**

JOHN KING, Warden,

    Respondent.

_____

This matter is before the undersigned United States Magistrate Judge on Charles Ray Barnes's Petition for Habeas Corpus by a Person in State Custody [Docket No. 1]. The case has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

I.    **FACTUAL AND PROCEDURAL BACKGROUND**

On February 5, 2005, Petitioner, Charles Ray Barnes ("Petitioner"), was found guilty and sentenced to life in prison on the conviction for first-degree domestic abuse murder of his ex-wife, Erin Rooney, under Minn. Stat. § 609.185(a)(6). Barnes v. State, 768 N.W.2d 359, 360 (Minn. 2009) ("Barnes II").

Petitioner appealed his conviction to the Minnesota Supreme Court on several grounds, including abuse of discretion by the trial court in denying his motion for a mistrial or continuance when his expert became unavailable to testify and ineffective assistance of counsel relating to the failure of his trial counsel to present any medical expert testimony. See State v. Barnes, 713 N.W.2d 325, 333, 335 (Minn. 2006) ("Barnes I").

1

The Minnesota Supreme Court described the facts bearing on the habeas petition as follows:

> At trial, the state introduced medical evidence through the medical examiner who performed the autopsy, Dr. Thomas, and a forensic pathologist who reviewed Dr. Thomas' conclusions, Dr. Dean Hawley. The state's theory was that Barnes strangled Rooney during the course of a domestic assault, and then injected her with heroin to create the appearance of a drug overdose. FN1 Dr. Hawley gave his opinion that each of Rooney's injuries occurred while she was still alive and that she died from asphyxiation due to manual strangulation.
>
>> FN1. The state presented evidence that the puncture mark on Rooney's right arm did not reach her vein, Rooney hated needles, Rooney was right-handed, and that her lungs did not contain a certain crystal typically found in intravenous drug users. Dr. Hawley testified that Rooney's heroin level appeared to be one large dose injected shortly before her death.
>
> Barnes' theory was that Rooney died from an overdose of heroin and alcohol. On cross-examination of the state's witnesses, he tried to show that all of Rooney's injuries could be explained by other causes. He argued that the drugs and alcohol she consumed caused her to fall down and bump into things, which caused all of her bruises and abrasions. He also suggested that the hyoid bone either broke when Rooney fell and hit some furniture, or when the coroner's investigator mishandled Rooney's body. Finally, he suggested that the neck hemorrhages were the result of an improper autopsy procedure.
>
> Because of the importance of the medical testimony, defense counsel applied to the court for, and was granted, state funds to hire two different medical experts. FN2 The court carved out an exception to its sequestration order allowing Barnes' expert to be present during the state's medical testimony to aid in cross-examination. Barnes did not take advantage of this authorization. Barnes listed only one of the two experts as a potential witness. After the state closed its case, Barnes reported that the listed expert witness was unable to appear. Barnes moved for a mistrial

2

> or for a continuance, suggesting that the time was needed to retain another expert. Barnes only gave a vague reason why the listed witness was unable to appear, and did not explain why the other expert he had retained was not listed as a witness, or who he would now seek to retain. The court denied his motion.
>
>> FN2. The expert witness fund of the state public defender's office was previously depleted.

Id. at 329.

In connection with Petitioner's claim that he should have been granted a mistrial or continuance to find a new expert to refute a portion of Dr. Hawley's testimony bearing on his opinion that the victim died of manual strangulation, the Minnesota Supreme Court explained that Petitioner had asserted that Dr. Hawley had testified that "a phenomenon known as the Prinsloo Gordon artifact only occurs in decomposed bodies." Barnes I, 713 N.W.2d at 334. "The Prinsloo Gordon artifact is a disruption of the body during the autopsy that creates the appearance of pre-mortem neck hemorrhaging. It is caused by an improper dissection technique, not pre-death violence." Id. n. 6. "At trial Barnes argued that the hemorrhage observed in [the victim's] neck was an 'artifact' from the autopsy, not an 'injury' from strangulation." Id. The Supreme Court affirmed the trial court's refusal to grant a mistrial or continuance, finding that the court had taken appropriate steps to ensure that Petitioner had adequate access to expert medical advice at trial, Petitioner's explanation in support of the request for the continuance did not amount to good cause, and Petitioner misunderstood or exaggerated the importance of the challenged portions of Dr. Hawley's testimony. Id. at 333.

3

As to Petitioner's ineffective assistance of counsel claim, the Minnesota Supreme Court found that it could not make a determination on this issue based on the trial record:

> To the extent that Barnes' ineffective assistance of counsel claim relates to the failure to present any defense medical expert testimony, it cannot be determined on the trial record. We are not able to determine whether this omission was a tactical decision, the result of a decision concurred in by Barnes, the failure to locate any witness who could help his case, or some other reason. Because additional facts are needed to review this issue, it is more properly suited for a postconviction proceeding. Black v. State, 560 N.W.2d 83, 85 n. 1 (Minn. 1997). Therefore, we reject this aspect of Barnes' ineffective assistance of counsel claim without prejudice to the right of Barnes to attempt to develop and present such claim in a postconviction petition.

Id. at 335.

Following this decision by the Minnesota Supreme Court, Barnes submitted a pro se petition for post-conviction relief. Barnes II, 768 N.W.2d at 362. The main issue under review was Petitioner's ineffective assistance of counsel claim based on his trial counsel's failure to present expert medical testimony.[1] See Appendix A [Docket No. 4] Post-Conviction Hearing Transcript ("Tr."), A-3-4. Petitioner's trial attorneys, Suzanne Flinsch ("Flinsch") and Mary Wingfield ("Wingfield"), testified at the hearing. Tr. A-4-5.

Flinsch testified that she and Wingfield met with Dr. Janice Ophoven ("Dr. Ophoven") twice regarding the present case, while their paralegal met with Dr. Ophoven on one occasion. Tr. A-16. It was Dr. Ophoven who first referred defense counsel to the opinion that the "Prinsloo Gordon artifact" could occur in a "freshly dead body." Tr.

---

[1] The post-conviction court also heard testimony regarding petitioner's suggestion that he was not competent to stand trial. Tr. A-10-16, 40.

4

A-17, A-31. Flinsch further testified that the defense had consulted with two additional experts, including Dr. Shaku Teas ("Dr. Teas"). Tr. A-17-18. Flinsch believed that Dr. Teas could confirm the Prinsloo Gordon artifact and that the victim's heroin overdose would be lethal. Tr. A-18. The file was sent to Dr. Teas, and she was paid for her consult. Id.

Flinsch stated that Dr. Ophoven and Dr. Teas believed that the cause of death could have resulted from heroin and alcohol intoxication and that "the broken hyoid bone and the bleeding in the musculature could have occurred postmortem. Tr. A-24-25. Flinsch also indicated that Dr. Ophoven believed the victim died from a heroin overdose, or alternatively, from manual strangulation. Tr. A-26. However, Dr. Ophoven and Dr. Teas were not called to testify as to the cause of death because neither could exclude manual strangulation as the cause of death. Tr. A-24, A-26-27.

> Q   So it would be fair to say that you spoke with at least two experts, and neither of them were able to come in and give a different cause of death?
>
> A.   Basically that's correct.

Tr. A-27.

Wingfield testified that the defense had exhausted its money trying to find an expert that would testify that the victim did not die from strangulation, including Dr. Teas and another expert from Texas, to no avail. Tr. A-33-34.

According Flinsch, Dr. Ophoven did not believe that there would be "any contest with respect to the anatomy and certain principles, but that if someone testified differently, an expert testified differently, that she would make herself available." Tr. A-7. That is, Dr. Ophoven would come to the trial and listen to the testimony, and if there

was any unexpected testimony, she would testify. Tr. A-7, A-9. Similarly, Wingfield testified that Dr. Ophoven stated that she would be available as a witness, and if she was not a witness, she would at least be present in the courtroom, behind the counsel table, to the extent the defense needed to refer questions to her. Tr. A-30. Wingfield also provided that Dr. Ophoven stated, through her assistant, that she would be available via the telephone. Tr. A-31. Dr. Ophoven was not listed as an expert witness for the defense and was only going to serve as a possible rebuttal witness and a consultant for the defense. Tr. A-32-33.

Once Dr. Hawley testified, Flinsch realized that the defense needed Dr. Ophoven's assistance with regards to Dr. Hawley's testimony dealing with Prinsloo Gordon artifact, the cause of death and the use of heroin. Tr. A-7.[2] Counsel believed that Dr. Ophoven would testify differently than Dr. Hawley, and that her testimony would have been consistent with the medical examiner's testimony, which had been satisfactory. Tr. A-7-8. Wingfield testified that counsel had no medical background to

---

[2] Dr. Hawley testified that based on his review of the slides, Dr. Thomas' report and his review of the photographs, there was hemorrhaging in the muscles. Tr. A-20. He stated that he had reviewed one of the slides of the lungs to determine whether certain crystals were present in the lung tissues which would tell him whether the victim had used illicit drugs intravenously. Tr. A-20. Dr. Hawley also testified that the Prinsloo Gordon artifact is superficial blood that can mimic hemorrhaging, but that it is not found in the muscle. Tr. A-20-21. Flinsch testified that neither Dr. Thomas nor Dr. Hawley made any mention in their written reports of any slides from the autopsy and consequently, no slides were obtained by defense counsel for review by their experts. Tr. A-19. Consequently, when counsel could not reach Dr. Ophoven, they asked for a continuance to address Dr. Hawley's testimony about the slide and the lack of blood in the muscle, which counsel believed was in direct conflict with what they had been told by Dr. Ophoven. Tr. A-20-21. Petitioner had also contended that he needed an expert to counter Dr. Hawley's testimony at trial that the victim's broken hyoid bone was evidence of the extreme pressure placed on her neck, as opposed to occurring postmortem. Barnes, 713 N.W.2d at 334-35; see also Tr. A-24-25.

cross-examine Dr. Hawley and that they needed someone to challenge his testimony or to at least advise counsel on how to "poke holes" in his testimony. Tr. A-34-35.

Defense counsel tried to reach Dr. Ophoven, to no avail. Tr. A-8. When the defense finally reached Dr. Ophoven's assistant, they were told that she was not available to come in and that she was out of town. Tr. A-8, A-31. Dr. Ophoven only resurfaced after the trial was over and the verdict was delivered. Tr. A-8. Flinsch suspected that Dr. Ophoven did not show up at trial because of external pressure from the State, for which she had provided testimony in cases involving children, not to perform work for the defense. Tr. A-9; see also Barnes II, 768 N.W. 2d at 362. Flinsch knew that Dr. Ophoven was not anxious to testify because it "put her in a funny position as far as her job goes. But at no time did she say she wouldn't testify. In fact, she indicated that she would if really needed her." Tr. A-9.

Upon learning that Dr. Ophoven would not appear at the trial, Flinsch asked for a continuance, stating to the trial court:

> I have no reason to expect that Dr. Ophoven is going to make herself available, so I'm assuming because both of these issues don't specifically relate to this case but to general principles of anatomy and pathology that we could find a pathologist within a week to bring in to testify as to those two medical principles. I have no intention of asking an expert to testify about cause of death or review the file.

Tr. A-23.

Both Flinsch and Wingfield testified that it was not a tactical decision not to call Dr. Ophoven as witness, but rather it was Dr. Ophoven's decision not to appear. Tr. A-6, A-37.

7

Flinsh also provided the following testimony at the post-conviction hearing regarding Petitioner's claim of ineffective assistance of counsel

> Q. Do you think that with Dr. Hawley's testimony about, you know, the question and the other stuff that he threw at us, it deemed your counsel ineffective because you were not ready -- you weren't prepared for it?
>
> A. I felt very badly about this case because of the expert situation because I felt that we would have had a fighting chance if we had the expert. Who knows what the jury would have done with it, but that we'd have a -- that at least our case would have been fully aired if we had had an expert. And obviously we did not have her under subpoena. I don't know if you could subpoena an expert. And we did not have a written retainer agreement. This is a first-degree murder case, and I felt I was completely remiss to not have that acquired before we went into the courtroom and started the trial.

Tr. A-9-10.

The trial court denied Petitioner's petition for post-conviction relief. See Appendix B [Docket No. 4], Order Denying Post-Conviction Relief and accompanying Memorandum. The court found that in order to prevail on an ineffective assistance of counsel claim:

> First, Petitioner must prove by a preponderance of the evidence that a counsels' performance was constitutionally inadequate. Second Petitioner must establish that but for the errors, the trial result would have been different. In other words, counsel's errors were so serious as to deprive him of a fair trial.

Id., B-48 (citations omitted).

The court concluded that the "failure to call a medical expert witness was not due to ineffective assistance of counsel." Id. The court explained that "despite the considerable efforts of defense counsel, including the expenditure of $9500 in court-

8

approved funds for consultation with various medical experts, no expert witness was able or willing to testify to a different cause of death." Id. The court noted that at least two medical experts reviewed the case for the defense, that the defense decided to use these experts as consultants and the defense relied upon their expertise in developing the cross-examination of the State's experts. Id. The court also observed that Petitioner had not presented testimony, at the hearing or by affidavit, "that it was ineffective assistance of counsel for the defense legal team to present its medical theories in the manner to chose to use at trial." Id. In sum, the court held that Petitioner had "failed to establish by a preponderance of the evidence, that counsels' performance fell below an objective standard of reasonableness." Id., B-49.

The Minnesota Supreme denied Petitioner's request for a remand of his ineffective assistance of counsel claim, and with no analysis, "affirm[ed] the postconviction court's determination of Barnes' postconviction claims." Barnes II, 768 N.W.2d at 365.

Subsequently, Petitioner filed the instant habeas corpus petition, which asserted only the ineffective assistance of counsel claim. Specifically, Petitioner claimed:

> Trial counsel failed to procure and present expert medical testimony to counter or rebut the state's medical experts' evidence of the cause and manner of death, which was the dispositive fact issue at trial. Petitioner summoned 911 personnel to an apartment that he shared with the homicide victim when he found her unconscious; petitioner attempted resuscitation before emergency personnel arrived. These first responders pronounced the victim dead at the scene. In this homicide prosecution, the state medical examiner and the state's retained forensic pathology expert testified that the cause of death had been strangulation, and that the manner of death was thus a homicide. Both experts acknowledged, however, that a toxicology report showed that the victim had a potentially fatal level of opiates in her

9

> system at the time of death. The state medical examiner acknowledged that some of the injuries to the victim could have preceded death by up to twenty-four hours and that other injuries could have occurred during the resuscitation efforts; the state's retained expert, however, made no such concessions, insisting that the cause of death could only have been strangulation. The defense theory was that the injuries to the victim were caused accidentally and that the actual cause of her death was a fatal overdose of heroin in combination with alcohol. Although defense counsel had consulted with medical experts, counsel did not present any expert medical testimony to either counter or rebut the expert evidence presented by the state, a decision that one of petitioner's counsel conceded was not a trial tactic. Indeed, counsel stated that one of the experts had inexplicably been unavailable during trial. The state post conviction court, at a time when petitioner was representing himself after the state public defender had declined to represent him, determined that trial counsel had not provided ineffective assistance of counsel by failing to procure and present its own expert medical testimony. After petitioner retained counsel, the post conviction court also determined that petitioner could not reopen the post-conviction proceeding to seek to present additional medical evidence, thus depriving petitioner of the opportunity fully to develop the record.

See Petition at p. 5.

Respondent opposed the Petition, arguing that based on the strict standards set forth by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Petitioner's claims fail. Respondent's Memorandum in Support of Answer to Petition for Writ of Habeas Corpus ("Resp. Mem.") [Docket No 4], p. 10. According to Respondent, the state courts' determinations did not involve an unreasonable application of clearly established law federal law as set forth Strickland v. Washington, 466 U.S. 668 (1984), or an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." Resp. Mem., p. 10-11.

In response, Petitioner submitted that the state court unreasonably applied the principles of Strickland to his case where his counsel failed to present Dr. Ophoven's opinion that heroin toxicity could not be excluded as the cause of death (even if she was not willing to exclude strangulation as the cause of death), an opinion not shared by the state's experts. See Petitioner's Memorandum in Support of Petition for Writ of Habeas Corpus ("Pet. Mem.") [Docket No. 5], at pp. 7, 9, 12. Petitioner also claimed the state court's determination was based on an unreasonable determination of the facts, where both counsel testified at the post-conviction hearing that they needed an expert to counter Dr. Hawley's testimony regarding the broken hyoid bone and the bleeding in the neck, and Dr. Flinsch was willing to state that heroin toxicity could not be excluded as to the cause of death. Id., at pp. 13-14. According to Petitioner, such a misapprehension or misstatement of the record that "'goes to a material factual issue that is central to petitioner's claim, . . . can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable.'" Id., at pp. 14-15 (quoting Taylor v. Maddox, 366 F.3d 992, 1001 (9th Cir. 2004).

Finally, at the end of his memorandum, Petitioner asserted for the first time:

> A state court's factual determinations are also unreasonable if the fact finding process is defective. Petitioner sought without success to re-open the state court proceedings to develop fully all aspects of trial counsel's failure to have presented evidence to support its argument to the jury in opening statement that the cause and manner of death was heroin toxicity and not asphyxiation as a result of strangulation. Petitioner's incomplete hearing was, in terms of what he needed to establish, the same as no hearing at all.

11

Id., at p. 15 (citing Weaver v. Thompson, 197 F.3d 359, 363 (9th Cir. 1999)).[3]

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs a federal court's review of habeas corpus petitions filed by state prisoners. Section 2254 of the AEDPA provides that a district court will entertain a petition for writ of habeas corpus submitted by a person in custody pursuant to a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

In addition, 28 U.S.C. § 2254 provides that a habeas corpus petition:

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Court of Appeals for the Eighth Circuit has described the review under § 2254(d)(1) as follows:

> A state court's decision is "contrary to" federal law "if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme]

---

[3] Petitioner did not identify which state court proceeding he sought to re-open to fully develop his ineffective assistance of counsel claim. Nevertheless, the Court assumes he was referring to his attempt to re-open the post-conviction proceeding with the assistance of counsel. See Pet. Mem., p. 7; Tr. C-50; Barnes II, 768 N.W.2d at 363.

> Court but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 [ ] (2005). A decision involves an "'unreasonable application" of federal law if the state court correctly identifies the governing legal rule but applies it in an objectively unreasonable manner, id., unreasonably extends a legal principle to a new factual context where it should not govern, or unreasonably refuses to extend a principle to a context where it should apply, Williams v. Taylor, 529 U.S. 362, 407-08 [ ] (2000).

Moussa Gouleed v. Wengler, 589 F.3d 976, 980 (8th Cir. 2009).

"A federal court may not issue the writ simply because it 'concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" Engesser v. Dooley, 457 F.3d 731, 735-36 (8th Cir. 2006) (quoting Williams v. Taylor, 529 U.S. 362, 411 (2000)).  Under this standard, the federal court "must deny a writ – even if we disagree with the state court's decision – so long as that decision is reasonable in view of all the circumstances." May v. Iowa, 251 F.3d 713, 716 (8th Cir. 2001) (citing Williams, 529 U.S. at 409-13).

Under § 2254(d)(2), a state court decision involves "an unreasonable determination of the facts in light of the evidence presented in state court proceedings," only if it is shown that the state court's presumptively correct factual findings do not enjoy support in the record.  28 U.S.C. § 2254(e)(1).  Pursuant to § 2254(e)(1):

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Here, Petitioner is proceeding under both 28 U.S.C. § 2254(d)(1) and (2). See Pet. Mem. [Docket No. 5].

With these standards of review in mind, this Court now turns to Petitioner's ineffective assistance of counsel claim.

## III. DISCUSSION

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). To state a claim for ineffective assistance of counsel, Petitioner "must demonstrate that (1) 'counsel's representation fell below an objective standard of reasonableness;' and (2) 'the deficient performance prejudiced the defense.'" Miller v. Dormire, 310 F.3d 600, 602 (8th Cir. 2002) (quoting Strickland, 466 U.S. at 687-88); see also Williams v. Norris, 612 F.3d 941, 954 (8th Cir. 2010) ("To prevail on a Strickland claim, a defendant must show that his counsel was deficient and that the deficient performance prejudiced the defense."). "To satisfy the second part of the Strickland test, the petitioner must prove that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Garrett v. Dormire, 237 F.3d 946, 950 (8th Cir. 2001) (quoting Strickland, 466 U.S. at 694); Miller, 310 F.3d at 602 (same); see also Yoder v. United States, NO. 08-2962, 352 Fed. Appx. 123, 2009 WL 3789928 at *1 (8th Cir. Nov. 13, 2009) ("for ineffective-assistance claim, movant must show that counsel's representation was deficient, and that it prejudiced his case such that there is reasonable probability that result would have been different.") (citation omitted). In ineffective assistance of counsel claims, there is a strong presumption that counsel's challenged actions or omissions were, under the circumstances, sound trial strategy.

14

Strickland, 466 U.S. at 689; see also Marcrum v. Luebbers, 509 F.3d 489, 502 (8th Cir. 2007) ("the burden of proof is on the petitioner to show that 'his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy.'") (quoting Kimmelman v. Morrison, 477 U.S. 365, 384 (1986)); Collins v. Dormire, 240 F.3d 724, 727 (8th Cir. 2001) (in determining whether counsel's performance was deficient, the court should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . .") (quoting Strickland, 466 U.S. at 689).

Conclusory allegations that counsel failed to utilize unidentified evidence or that the outcome would have been different had such evidence been presented at trial are insufficient to demonstrate that counsel was ineffective or that a habeas petitioner was prejudiced. See United States v. Delgado, 162 F.3d 981, 983 (8th Cir. 1998) (concluding that naked assertions that an attorney failed to call exculpating witnesses are insufficient to show counsel was ineffective or that defendant was prejudiced).

Based on the review of the record, including the transcript of the post-conviction hearing, the order of the post-conviction judge and decisions of the Minnesota Supreme Court, this Court concludes that the state courts' determination that Flinsch and Wingfield's representation of Petitioner did not fall below an objective standard of reasonableness was neither an unreasonable application of Strickland nor an unreasonable determination of the facts in light of the evidence presented in state court proceedings.

First, as to Petitioner's suggestion that his trial counsel were unprepared and ill-equipped to counter all of the testimony of Dr. Hawley, (Pet. Mem. at p. 13), this Court

finds to the contrary. Counsel exhausted their efforts, and the money available to them, to find an expert that would testify that the available medical evidence demonstrated that strangulation could be excluded from a possible cause of death, and Petitioner presented no evidence upon which this Court could reach a different conclusion. Petitioner provided no information to the post-conviction court or this Court as to which experts should have been called, what their testimony would have been or how their testimony would have affected the outcome of his trial. Indeed, Petitioner, acknowledged that he did not thoroughly explore during the post-conviction hearing what Dr. Ophoven's opinions were, nor did he arrange to have doctor testify. See Pet. Mem. at p. 14 n. 3. Petitioner's failure to present such evidence is fatal to an ineffective assistance of counsel claim. See Rodela-Aguilar v. United States, 596 F.3d 457, 462 (8th Cir. 2010) (quoting Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009)) ("a claim of ineffective assistance based on the failure to consult and call an expert requires 'evidence of what a scientific expert would have stated' at trial in order to establish Strickland prejudice."); Delgado, 162 F.3d at 983; Smith v. Roehrich, NO. CIV. 08-6113 (RHK/JJK), 2009 WL 3615022 at *7 (D. Minn. Oct. 27, 2009) ("Petitioner's assertion that his trial counsel failed to call expert witnesses fails for the same reason that his assertions regarding other defense witnesses fail; specifically, Petitioner has not identified who the expert witnesses are who allegedly should have been called to testify, what their testimony would have been, and how that testimony would have benefited Petitioner's defense.") (citation omitted); Gail v. Dingle, Civil No. 08-404 (JMR/JSM), 2010 WL 681302 at *10 (D. Minn. 2010) ("Petitioner's failure to provide how the subpoenaed witnesses would have testified, identify the expert witness and how he or

she would have testified, and why such additional evidence, including the use of the Hennepin County Examiner's report, would likely have affected the result of his trial, is fatal to his ineffective appellate counsel claim.").

It was not counsels' fault that no expert would testify that strangulation was not the cause of the victim's death. Counsel had retained what they believed were the resources of Dr. Ophoven to assist the defense in responding to the State's experts. They had her commitment to attend trial and listen to the testimony, to be available by phone and to testify, if needed. There was nothing unreasonable about counsel relying on Dr. Ophoven's representations regarding her availability that she would testify if the defense needed her.[4] Tr. A-7, A-9. Stated otherwise, it is not counsels' fault that Dr. Ophoven decided to make herself unreachable for the defense, when she represented she would be available to assist them. In fact, to counsels' credit, they requested a continuance for more time to retain an expert to respond to Dr. Hawley, which was denied.[5] To the extent that Petitioner is challenging his trial attorneys' failure to list Dr. Ophoven as a expert witness, as opposed to using her as rebuttal witness or an consultant, this is a matter of "strategic choices" that are "are virtually unchallengeable." Strickland, 466 U.S. at 690.

---

[4]   While Flinsch may have felt badly or remiss that she had not subpoenaed Dr. Ophoven or obtained a written retainer agreement from her, the Court has no reason to believe that such steps would have changed the outcome. As a preliminary matter, attorneys generally do not subpoena their own experts. More to the point, Dr. Ophoven had been hired by defense counsel to assist them and promised to appear at trial. A written retainer agreement could have memorialized the promise and the scope of the retention, but it could not insure that Dr. Ophoven would have fulfilled her promises.

[5]   Petitioner did not challenge the trial court's failure to provide the requested continuance as part of the instant habeas petition.

Second, Petitioner's arguments that counsel should have called Dr. Ophoven to testify that neither heroin toxicity nor strangulation could be excluded as to the cause of the victim's death, and to counter Dr. Hawley's testimony regarding the broken hyoid bone and the bleeding in the neck, finds no support in the record. Counsel testified at the post-conviction hearing that Dr. Ophoven believed the victim died from a heroin overdose, or alternatively, from manual strangulation. Tr. A-26. However, neither attorney testified that Dr. Ophoven was willing to so testify, and in any event, the decision was made not to call Dr. Ophoven because she could not exclude manual strangulation as the cause of death.[6] Tr. A-24, A-26-27. Moreover, even if counsel had changed their mind in light of Dr. Hawley's testimony, and as Petitioner suggests they should have done, called Dr. Ophoven to testify that the victim could have died from either manual strangulation or heroin toxicity, this Court cannot conclude that there was a reasonable likelihood that the outcome would have been different. In truth, even Flinsch could not predict that testimony by Dr. Ophoven would have resulted in a not guilty verdict. The most Flinsch could say was that with Dr. Ophoven's testimony, "we would have had a fighting chance" and "[w]ho knows what the jury would have done with it,…" Tr. A-9.

The plain fact is that through no fault of counsel, Dr. Ophoven had rendered herself unavailable and decided not to live up to her promise to appear and assist at the trial. Most importantly, Petitioner has failed to establish that had Dr. Ophoven appeared

---

[6] On cross-examination regarding Petitioner's competency to stand trial, Flinsch testified that she had conversations with Petitioner on trial strategies, he had input into those decisions, and he appeared to understand what was being discussed regarding trial strategies. Tr. A-15-16. Petitioner provided no testimony or evidence to the contrary.

18

and testified to the alternative causes of death, "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Garrett, 237 F.3d at 950 (quoting Strickland, 466 U.S. at 694)).

Third, Petitioner's challenge to the state courts' refusal to re-open the post conviction hearing to allow him to fully explore, with the assistance of counsel, all aspects of trial attorneys' failure to present expert testimony to support his claim that the cause and manner of death "was heroin toxicity and not asphyxiation as a result of strangulation', (Pet. Mem. at p. 15), was never raised as part of the present Petition. Instead, it was raised for the first time in reply to the State's response to the petition. Therefore, it is not properly before and cannot be considered by this Court. See Christian v. Dingle, Civil No. 06-3056 ADM/JSM, 2008 WL 2467754 at *2 (D. Minn. June 16, 2008) ("The five claims that Petitioner raised for the first time in his reply brief were properly rejected, without being addressed on the merits, because '[a] Traverse is not the proper pleading to raise additional grounds for relief.'") (quoting Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994), cert. denied, 514 U.S. 1026 (1995)); see also Tyler v. Mitchell, 416 F.3d 500, 504 (6th Cir. 2005), cert. denied, 547 U.S. 1074 (2006) ("Because the penalty-phase insufficiency argument was first presented in Tyler's traverse rather than in his habeas petition, it was not properly before the district court, and the district court did not err in declining to address it.") (citing United States v. Barrett, 178 F.3d 34, 46 n. 6 (1st Cir. 1999); Jackson v. Duckworth, 112 F.3d 878, 880 (7th Cir. 1997)) (citation omitted).

For all of these reasons, this Court finds that the post-conviction court and ultimately, the Minnesota Supreme Court, reasonably applied federal law and

reasonably determined the facts in light of the evidence presented by Petitioner, when it concluded that his ineffective assistance of counsel claim lacked any merit. Petitioner's ineffective assistance of counsel claims should be dismissed.

## III.  RECOMMENDATION

For the reasons set forth above and based on all the files, records, and proceedings herein, IT IS RECOMMENDED that:

Ray Barnes's Petition for Habeas Corpus by a Person in State Custody [Docket No. 1] be **DISMISSED WITH PREJUDICE**.


Dated:    November 17, 2010


s/ *Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge


Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **December 1, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this Rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.